USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/23/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
DW LAST CALL ONSHORE, LLC et al., :
:
                          Plaintiff, :    17-CV-962 (JMF)
:
          -v- :    OPINION AND ORDER
:
FUN EATS AND DRINKS LLC, :
:
                          Defendants. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiffs DW Last Call Onshore, LLC and DW Last Call Offshore, LLC (together, "DW") sue Fun Eats and Drinks LLC ("FEAD") for breach of contract, for breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment. The contract at issue in their dispute is a March 12, 2014 Credit Agreement (the "Credit Agreement") between certain lenders and Last Call Guarantor, LLC ("Last Call"). FEAD now moves, pursuant to Rules 12(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint. (Docket No. 41). For the following reasons, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

      The following facts, which are taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013).

      In 2014, a Dallas-based restaurant group experiencing "declining sales and rising costs" filed for bankruptcy and was acquired by a company known as "Last Call." (Docket No. 1 ("Notice of Removal"), Ex. A ("Compl."), ¶ 13). In connection with the sale, Last Call entered

into the Credit Agreement with a group of lenders. (*Id.* ¶ 14). The Credit Agreement provides for two tranches of debt: "a senior priority Term A Loan" of approximately $9 million (the "Term A Loan") and a "subordinate" Term B loan of approximately $68 million (the "Term B Loan"). (*Id.* ¶ 14). It also calls for the designation of an Agent with certain powers and responsibilities. (Notice of Removal, Ex. 3 ("Credit Agreement"), at 60-68). Among other things, the Agent is required to share "all proceeds of Collateral" through a distribution waterfall that includes Term A lenders. (Compl. ¶ 16; *see also* Credit Agreement 18-19). To the extent relevant here, the Agreement also requires Term A lenders to equitably share payments they receive in excess of their shares under the Credit Agreement. (Compl.¶ 17; *see also* Credit Agreement 82).

In May 2016, Last Call defaulted on its debt repayment obligations under the Credit Agreement. (Compl. ¶ 19). At the same time, "DW identified Last Call as a promising turnaround candidate," and acquired all of Last Call's equity, almost all of Last Call's second lien debt, and a "$3.2 million participation interest in the Term A Loan that had been held by" a group of lenders, including Ableco Finance LLC and Cerberus Leveraged Loan Opportunities Fund I, L.P. (collectively, the "Original Lenders"). (*Id.* ¶ 20). A few months later, in August 2016, Last Call filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware. (*Id.* ¶ 21). Shortly thereafter, FEAD acquired the rest of the Term A Loan, leaving FEAD (the majority holder) and the Original Lenders (now minority holders) as the only two entities holding the Term A Loan, with DW retaining a participation interest in the Original Lenders' $3.2 million share of the Term A Loan. (*Id.* ¶ 22). FEAD also acquired all but $2.9 million of the Term B Loan. (*Id.* ¶ 22; *see also* Docket No. 46 ("Pls.' Br."), at 4, 6). By virtue of these two acquisitions, FEAD became the "Required Lender" under the Credit Agreement — defined as

the lender holding more than "sixty six and two-thirds percent" of the Term A and Term B loans, (*see* Credit Agreement 114) — a position that permitted FEAD to appoint the Agent, (*see id.* at 66). FEAD appointed itself Agent. (Compl. ¶ 23). Less than a month after this appointment, Last Call's assets were to be sold in a bankruptcy auction. (Compl. ¶ 26).

Plaintiffs allege that FEAD abused its powers as lender before, during, and after the close of the sale transaction. (*See id.* ¶¶ 24-25, 38, 43). For instance, Plaintiffs claim that, before the bankruptcy proceedings concluded, FEAD vetoed DW's agreement with the Original Lenders to elevate DW's participation interest in the Term A Loan into a direct assignment. (*Id.* ¶ 25(a)). Plaintiffs also claim that FEAD extended debtor-in-possession financing to Last Call in an amount over $5 million and with priority over the Term A Loan, but conditioned on Last Call's agreement to "cash collateralize" approximately $3 million of the Term B Loan, in an attempt to "upend the agreed loan priority structure" detailed in the Credit Agreement. (*Id.* ¶ 25(b)). As Agent, FEAD consented to this financing structure. (*Id.* ¶ 25(b)).

In September 2016, the Bankruptcy Court approved bid procedures, over DW's objection, authorizing FEAD, as Agent, to "accept non-cash consideration in satisfaction of First Lien Obligations." (Notice of Removal, Ex. 7 ("Bid Procedures Order"), at 7). Pursuant to those procedures, "non-cash consideration . . . in satisfaction of any portion of First Lien Obligations" was "deemed to have a value at the Auction in the amount of such First Lien Obligations proposed to be so satisfied." (*Id.* at 10). At the auction, DW and FEAD were the only two bidders for Last Call's assets. (Compl. ¶ 26). DW submitted an all-cash bid that "would have permitted Last Call to repay the [debtor-in-possession] loan and the Term A Loan obligations in full," as well as the "outstanding amounts on Last Call's unpaid restaurant leases, thereby ensuring the continuity of its business." (*Id.* ¶ 27). By contrast, FEAD's bid offered no cash;

3

instead, FEAD offered to accept, in full satisfaction of the $9 million Term A Loan, a subordinated unsecured note (the "Promissory Note") of approximately $8.9 million and payable in 2023. (*Id.* ¶¶ 28-29). FEAD also offered to assume its own debtor-in-possession loan, to cure the unpaid lease liabilities, and to satisfy a portion of the Term B Loan. (*Id.*). FEAD (as Agent) accepted the non-cash consideration — the Promissory Note — submitted by FEAD (as bidder); per the Bid Procedures Order, once the Agent accepted the non-cash consideration, the Promissory Note was deemed to fully satisfy the $9 million Term A Loan. (*Id.* ¶ 28; Bid Procedures Order 10). Because FEAD's non-cash bid "provided the greater reduction in debt to the bankruptcy estate," Last Call chose FEAD as the successful bidder; the Bankruptcy Court approved the sale over DW's objection. (Compl. ¶ 32).

After the sale was completed, DW alleges that FEAD continued its wrongful conduct. (*Id.* ¶ 33). DW claims that FEAD received all of Last Call's collateral in the sale, but did not share any of the collateral as required by the waterfall provision in the Credit Agreement. (Credit Agreement 18-19). DW contends that FEAD received "excess" payment in exchange for satisfying the Term A Loan obligation by deeming the noncash to have equal value to the amount of that Loan's debt. (Compl. ¶¶ 33, 34). Under DW's reading of the Credit Agreement, FEAD was required to share that excess ratably with all Term A lenders. (*Id.*). It did not do so.

In November 2016, after the sale but before this lawsuit, the minority lenders entered into an agreement pursuant to which they assigned "all . . . right, title and interest in, to and under any and all claims, causes of action, [and] contract rights . . . against . . . any . . . person or entity under and in connection with the Loans, the Credit Documents, the Borrower's bankruptcy proceedings . . . , or any sale, financing or other transaction arising under the [bankruptcy] Proceedings" to an entity known as DW Value Master Fund. (Docket No. 45 ("Sebrow Decl."),

4

Ex. A, at 1-2). DW Value Master Fund, in turn, assigned those same claims and causes of action to DW, Plaintiffs here. (Pls' Br. 9-10). Thereafter, DW filed this suit in the Supreme Court of the State of New York, alleging breach of contract and breach of the implied covenant of good faith and fair dealing, and seeking a declaratory judgment requiring FEAD to "distribut[e to DW] such cash as received pursuant to the waterfall provision" of the Credit Agreement. (Compl. ¶ 49). FEAD removed the case to this Court, (Notice of Removal ¶ 3-7), and now moves to dismiss.

## LEGAL STANDARDS

FEAD's motion to dismiss is brought pursuant to Rules 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction to hear the case. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted). Additionally, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## DISCUSSION

FEAD makes three arguments for dismissal: that Plaintiffs lack standing, that their claims are precluded by the Bankruptcy Court's rulings, and that they fail to state a claim. The Court will address each argument in turn.

**A. Standing**

FEAD's first argument — that Plaintiffs lack standing — can be swiftly rejected. It is well established that "an assignee who holds legal title to an injured party's claim has constitutional standing to pursue the claim." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (citing *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008)). Here, the minority lenders assigned "all . . . right, title and interest in, to and under any and all claims, causes of action, [and] contract rights," including the claims at issue this case, to DW (through DW Value Master Fund). (Compl. ¶¶ 37, 42; *see also* Pls' Br. 13 n.5). That is plainly sufficient to establish DW's standing to sue.

Although FEAD devoted a substantial part of its initial brief to the argument that Plaintiffs lack standing, (Docket No. 43 ("Def.'s Br."), at 9-16), it only halfheartedly presses the point in its reply, arguing in a footnote that the assignment was ineffective because Section 9.9(b) of the Credit Agreement allowed the minority lenders to assign their rights only under circumstances not present here. (Docket No. 47, at 2 n.2 (citing *In re Allied Sys. Holdings Inc.*, 556 B.R. 581 (D. Del. 2016), *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131 (3d Cir. 2017))). On that basis, the Court could deem the point abandoned, *see, e.g.*, *In re Tronox Inc.*, 549 B.R. 21, 38 n.11 (S.D.N.Y. 2016), but it need not because the point is meritless in any event. Under New York law — which applies here, (*see* Credit Agreement 83) — "'no assignment' clauses" such as Section 9.9(b) "do not apply to assignment of claims after loss has occurred" unless they say otherwise. *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03-CV-3748 (DAB), 2006 WL 278138, at *5 (S.D.N.Y. Feb. 2, 2006) (collecting cases); *TAP Holdings, LLC v. Orix Fin. Corp.*, 45 Misc. 3d 1217(A), 5 N.Y.S.3d 330 (N.Y. Sup. 2014) ("[N]on assignment clauses do not apply to the assignment of claims after the loss has occurred."). That is, "[a]s a general matter, New York follows the majority rule that such a provision is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The assignment that occurred here occurred after the alleged breach. (*See* Compl. ¶¶ 37, 42). Section 9.9(b) does not speak to the assignment of such claims — and certainly does not preclude assignment of such claims in plain terms — and thus has no relevance to DW's standing.

The Court deems FEAD's other standing arguments to be abandoned, as it does not even allude to them in its reply. Nevertheless, they too lack merit. For instance, FEAD argues that the Complaint insufficiently specifies the assignment made by the minority lenders to DW.

7

(Def.'s Br. 14-15). DW's opposition, however, includes the "Assignment of Claims Agreement," (Sebrow Decl., Ex. A), which the Court may consider in assessing Plaintiffs' standing, *see, e.g.*, *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 516 (S.D.N.Y. 2017) ("[I]n resolving a motion to dismiss for lack of standing, . . . [a] court 'may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue . . . .'" (quoting *Attica Cent. Schs.*, 386 F.3d at 110)). Similarly, FEAD argues that DW lacks standing because the Complaint "ignores corporate form" by failing to allege "which DW entity suffered the alleged harm." (Def.'s Br. 16). But again, Plaintiffs' affidavits confirm that the Original Lenders' claims were ultimately assigned to Plaintiffs — DW Last Call Onshore, LLC and DW Last Call Offshore, LLC. (Sebrow Decl., Ex. B). In light of that record, DW has plainly "carried its burden of showing a valid assignment of a claim" by showing that the assignors "manifest[ed] an intention to make the assignee[s] the owner of the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 418 (2d Cir. 2015).

**B. Preclusion**

Next, FEAD contends that "principles of *res judicata* and collateral estoppel" — or claim preclusion and issue preclusion, respectively — compel dismissal of the Complaint. (Def.'s Br. 17). Claim preclusion and issue preclusion are "related but distinct" concepts. *In re Indu Craft Inc.*, No. 11-CV-5996 (JMF), 2012 WL 3070387, at *10 (S.D.N.Y. July 27, 2012) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)). Claim preclusion "bars the relitigation . . . of claims that were, *or could have been*, brought in an earlier litigation between the same parties or their privies." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010); *see also In re Old Carco LLC*, No. 14-CV-2225 (JMF), 2014 WL 6790781, at *2 (S.D.N.Y. Dec. 1, 2014). Issue preclusion bars relitigation where "(1) the identical issue was

raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (alteration in original). In either case, the preclusive effects of a final judgment are not "altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *accord Laaman v. United States*, 973 F.2d 107, 112 (2d Cir. 1992).

As the Second Circuit recently observed, "the standard res judicata analysis can be an awkward fit when applied," as in this case, "to bankruptcy proceedings." *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017). As the Court explained:

> Unlike a typical lawsuit, where one party brings an action against another, a bankruptcy proceeding provides a forum for multiple parties — debtors, creditors, bidders, etc. — to sort out how to allocate, among other things, a debtor's assets. . . . . In the bankruptcy context, therefore, instead of examining whether a subsequent lawsuit asserts claims that could have been included as part of a previous lawsuit, courts have assessed whether a new action seeks to bring claims that could have been raised and litigated within the scope of the bankruptcy proceeding.

*Id.* at 158. Additionally, in undertaking an analysis of whether prior bankruptcy proceedings preclude a claim, a court must "ask as well whether an independent judgment in a separate proceeding would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan. A party cannot avoid the preclusive effect of res judicata by asserting a new theory or a different remedy." *Id.* at 157 (citations and internal quotation marks omitted).

Applying those principles here, the Court concludes that DW's second cause of action — its "implied covenant claim" — constitutes an impermissible collateral attack on the Bankruptcy Court's rulings. By DW's own admission, that claim is "based upon FEAD's instruction to the

9

Agent to accept the promissory note in satisfaction of the Term A Loan at the auction." (Pls' Br. 23; *see also* Compl. ¶ 43 ("FEAD . . . intentionally devalu[ed] and reprioritiz[ed] the Term A Loan position so as to purchase the Collateral for its own exclusive benefit . . . .")). The Bankruptcy Court, however, explicitly authorized the Agent to accept non-cash consideration in its Bid Procedures Order, and the parties in the bankruptcy proceedings — including the Original Lenders and DW Value Master Fund, privies of DW — had ample opportunity in that setting to raise the arguments DW raises here. (*See* Bid Procedures Order 3 (finding that the parties, including the Original Lenders, had a "reasonable opportunity to object" to the procedures and that there were "good and sufficient business reasons for [the Bankruptcy] Court to approve . . . the Bid Procedures")). In fact, DW Value Master Fund lodged an objection on similar grounds that was overruled by the Bankruptcy Court. (*See* Notice of Removal, Ex. 6). In short, DW's implied covenant claim amounts to a thinly disguised attack on the Bid Procedures Order and "could have been raised and litigated within the scope of the bankruptcy proceeding." *Brown Media Corp.*, 854 F.3d at 158. Thus, it must be and is dismissed. For the same reasons, the Court will not permit DW to relitigate FEAD's approval (as Agent) of the extension of debtor-in-possession financing to Last Call. Indeed, that claim was raised and decided by the Bankruptcy Court. (*See* Def.'s Br. 18 (citing Notice of Removal, Exs. 4, 5)).[1]

---

[1] DW argues that the Bankruptcy Court "expressly preserved" these arguments for review in another court, (Pls' Br. 13), but that is overstated. DW fixes on the Bankruptcy Court's statement at the sale hearing that it would "leave DW with whatever rights it thinks it has to pursue a claim in another court." (Docket No. 24, Ex. 1 ("Sale Hearing Tr."), at 51). Later in the sale hearing, the Bankruptcy Court also stated that it would not "take jurisdiction over non-debtor battles." (*Id.* at 100). DW reads far too much into these statements: The substance of DW's implied covenant claim is plainly a rehashing of DW Value Master Fund's objections to the Bid Procedures Order (and not the sale hearing), which the Bankruptcy Court considered and rejected. (*See* Bid Procedures Order 3).

By contrast, DW's first and third causes of action — for breach of contract and for a declaratory judgment regarding FEAD's obligations under the Credit Agreement — are not subject to either issue or claim preclusion. Those claims arise from FEAD's "refus[al] to share the value of the collateral with Plaintiffs, in violation of Section 9.11 of the Credit Agreement." (Compl. ¶ 38; *see also* Compl. ¶ 49 (seeking a declaration requiring FEAD to "distribut[e] such cash as received pursuant to the waterfall provision" of the Credit Agreement)). That is, they are based upon FEAD's conduct "*after* its purchase of the Collateral." (Pls.' Mem. 23). By definition, therefore, they were not — and could not have been — decided by the Bankruptcy Court. Accordingly, claim preclusion does not apply. *See, e.g.*, *Cohen v. Utica First Ins. Co.*, 436 F. Supp. 2d 517, 522 n.4 (E.D.N.Y. 2006) (holding that claim preclusion does not apply where the "[p]laintiff could not have raised his claim . . . in the previous suit"). And, of course, issue preclusion does not bar the claims either because, *a fortiori*, they were not "actually litigated and decided in the previous proceeding." *Wyly*, 697 F.3d at 141. Accordingly, DW may proceed with its contract claims, but not its implied covenant claim.

## C. Failure to State a Claim

FEAD's sole remaining argument is that DW's first cause of action, for breach of contract, should be dismissed because "the Credit Agreement is unambiguous and does not support Plaintiffs' claim." (Def.'s Br. 21).[2] To survive a motion to dismiss for a breach of contract claim under New York law, the complaint must allege facts showing "(1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of*

---

[2] FEAD also argues that DW's implied covenant cause of action should be dismissed for failure to state a claim. (Def.'s Br. 23). Given the Court's conclusion that DW is precluded from pursuing the implied covenant cause of action, however, there is no need to reach that argument.

11

*N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). DW does so by alleging that FEAD breached Section 9.11 of the Credit Agreement in "receiving payment of its Term A Loan and Term B Loan in the form of the Collateral and subsequently refusing to share the value of the Collateral with Plaintiffs." (Compl. ¶ 38). FEAD characterizes DW's breach-of-contract claim as "essentially . . . that [DW] do[es] not like the Promissory Notes' seven-year term and five percent interest rate," (Def.'s Br. 21), but that is not a fair characterization of the Complaint itself. FEAD's remaining arguments go to the merits and are thus premature. Accordingly, the Court finds that DW states a plausible claim for breach of contract.

## CONCLUSION

For the reasons stated above, FEAD's motion to dismiss is GRANTED in part and DENIED in part. Specifically, DW's second cause of action, for breach of the implied covenant of good faith and fair dealing, is dismissed. DW's remaining claims, for breach of contract and for a declaratory judgment, survive. DW does not request leave to amend, and the Court declines to grant it *sua sponte*. *See, e.g.*, *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 821 F.3d 349, 351-52 (per curiam) (2d Cir. 2016) (holding that it was not an abuse of discretion to deny the plaintiffs an opportunity to amend their complaint where they "did not ask the district court for leave to amend"). Among other things, any amendment would plainly be futile given the basis for the Court's dismissal of the implied covenant claim. *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.").

Unless and until the Court orders otherwise, FEAD shall file an answer with respect to the surviving claims **within three weeks of this Opinion and Order**. Additionally, the parties

shall appear for an initial pretrial conference with the Court on **April 30, 2018, at 2:45 p.m.**, in Courtroom 1105 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York. In accordance with the Notice of Initial Pretrial Conference, (Docket No. 6), the parties shall file a joint letter and proposed Case Management Plan no later than the Thursday before the conference. The Clerk of Court is directed to terminate Docket No. 41.

    SO ORDERED.

Date: March 23, 2018
       New York, New York

_____
JESSE M. FURMAN
United States District Judge